In re HAROLD S.

No. 98–139–Appeal.

Supreme Court of Rhode Island.

June 9, 1999.

Aaron Weisman, Providence, for plaintiff.

Leo F. Manfred, Westerly, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

When a school principal questions a student about his or her possible involvement in alleged misconduct on school property that may amount to a violation of a criminal statute, must *Miranda*[1] warnings be given to the student? In the circumstances presented by this case, we hold that no such admonitions need be communicated.

The respondent, Harold S., a juvenile born on April 7, 1984, appeals from a Family Court adjudication of waywardness based upon his assault and battery of a fellow student (victim) at Frank E. Thompson Middle School in Newport, Rhode Island (Thompson Middle School). Following a conference held pursuant to Rule 12A of the Supreme Court Rules of Appellate Procedure, we ordered the parties to show cause why we should not decide the issues raised in this appeal summarily. None having been shown, we proceed to decide the appeal at this time.

The victim testified that he left school on September 10, 1997, and began walking through a parking lot in back of the school. There, he was approached from behind, spun around, and punched and kicked by two individuals. The victim stated that as soon as he was spun around, he saw two individuals whom he identified as the respondent and another student (accomplice). On cross-examination, however, the victim conceded that he was not sure who had punched and kicked him. He stated that he could not see anything because his face was in a bush. The victim also testi-

---

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

fied that he believed it was respondent and the accomplice because that was what other people had told him.

Other students testified that they witnessed the altercation from a distance. One boy testified that he was on a school bus the afternoon of September 10 when he heard someone declare that a fight was occurring. He looked out the bus window and saw respondent and the accomplice punching and kicking another individual whom he could not identify. After the fight ended, respondent, along with the accomplice, boarded the bus and told this witness that it was the victim whom they had "beaten down." Another witness, also a student at Thompson Middle School, testified that he likewise observed the altercation in question. This witness stated that he saw the accomplice tap the victim on the shoulder, at which point the victim turned around and the accomplice swung at him, causing the victim to fall. He testified that the respondent then joined the fight and began kicking the victim. He also stated that the next day, respondent informed some other students on the bus that if the authorities questioned him regarding the incident, then he would tell them that the victim had "touched [his] butt."

The principal of Thompson Middle School, Rodrigo S. Borgueta (principal), became aware of this incident the day after it occurred. A Newport police officer, Sergeant William J. Johnson (officer), approached him prior to the start of the school day and informed him that a fight had occurred after school the previous day and that the officer intended to speak later to the two students who allegedly were involved in the attack. After the officer left, the principal went to his office, where he discovered the victim and his parents waiting for him. At that time, they told him that respondent and the accomplice had assaulted the victim the previous afternoon. The principal then called respondent's father and when the father arrived, he also called respondent to the office.

Initially, respondent denied any involvement in the incident that occurred during the prior afternoon, but later he conceded that he hit the victim because the victim had "touched [respondent's] butt." The respondent also submitted to the principal a written statement to this effect. The principal admitted that, pursuant to his usual practice, he furnished this statement to the police upon their request.

The respondent moved to suppress this statement in the Family Court, arguing that he should have been informed of his *Miranda* rights before the principal questioned him and before he gave a written statement that was later turned over to the police. The trial justice denied the motion, finding that no constitutional violation had occurred. On appeal, respondent argues that the trial justice should have granted his motion to suppress because respondent, who had not waived his rights, was effectively in custody at the time he made the statement to the principal, who was acting as an agent for the police.

The respondent contends that his meeting with the principal in the latter's office amounted to a custodial police interrogation in a coercive environment. In support thereof, respondent cites *In the Matter of Killitz*, 59 Or.App. 720, 651 P.2d 1382 (1982), in which a juvenile made incriminating statements while a police officer interrogated him in the principal's office of his school. In that case, the court held that the trial court should have suppressed these statements because the police officer had not informed the juvenile of his rights prior to the questioning. The court determined that the interrogation deprived the juvenile of his freedom of action so as to render his interrogation custodial. Its reasoning depended on the presence of the following factors: (1) the juvenile was not free to leave during the interrogation because he was in school during regular school hours, where school personnel controlled his movements to a great extent; (2) the officer was present during the interrogation and questioned the juvenile as

a suspect, rather than a witness, because another student had implicated him in the crime; and (3) the juvenile did not go to the principal's office voluntarily and was not aware that a police officer would be present. *See id.* at 1383–84.

While the interrogation of respondent in this case bears some similarity to that of the *Killitz* case, a significant distinguishing factor is absent. In *Killitz,* an armed, uniformed police officer questioned the juvenile; whereas, in this case, no police officer was in the room, much less conducting any of the questioning, when respondent, in the presence of his father, made his statement to the principal. The *Killitz* court distinguished another case, *State ex rel. Juvenile Department of Clackamas County v. Gage,* 49 Or.App. 599, 624 P.2d 1076 (1980), for precisely this reason. In *Gage,* the *Killitz* court noted, school authorities questioned the juvenile regarding the theft of school lunch tickets with no official police involvement. The *Gage* court held that *Miranda* warnings were not required under such circumstances because the questioning occurred without police participation and for a school-related purpose, and therefore it did not amount to a criminal investigation. "In contrast, where a police officer conducts an inquiry regarding criminal activity that took place outside school, the criminal nature of the investigation is manifest." *Killitz,* 651 P.2d at 1384.

The respondent argues that although a police officer did not conduct the interrogation in this case, the principal was acting as an agent of the police when he questioned him. In support of this argument, respondent points to *Commonwealth v. Bordner,* 432 Pa. 405, 247 A.2d 612 (1968), in which the Supreme Court of Pennsylvania determined that the lower court did not err in suppressing a juvenile's statements to his mother and father because the parents were acting as agents of the police in their conversations with their son. In *Bordner,* police had suspected the juvenile of shooting his parents and then setting fire to their home, causing the death of seven children. The juvenile, the eldest child, was questioned on several occasions by his father and mother in the presence of police officers. After reviewing the circumstances of the conversations between the juvenile and his mother, the court concluded:

> "The circumstances reveal a plan on the part of the police authorities to use the mother as a police instrumentality in the interrogation of the accused son and the statements made to the mother, in the context of this factual setting, are as though made to the police themselves." *Bordner,* 247 A.2d at 617.

As to the conversations between the father and the juvenile, the court determined that the father also was acting as an agent of the police. The police were present during these conversations and frequently told the father what questions to ask his son. Thus, the court determined that the father's motive in speaking with his son was to aid the police in their investigation.

█ In the present case, respondent argues that the principal was acting as an agent for the police when he spoke with respondent. The principal testified that the officer informed him only that a fight had occurred after school the previous day, but gave him no further details. The officer was not present when the principal spoke to respondent; in fact, he had left the school grounds prior to the meeting. Moreover, the principal testified that the officer did not ask him to speak with respondent. The principal also indicated that regardless of whether the police are contacted, it was school policy to call the students involved to the office in the event of an accusation of a physical assault. Finally, he stated that it was his practice to obtain statements from the alleged victim and the alleged assailant and to turn those statements over to the police if he was requested to do so. The above testimony supports the conclusion that the principal was not acting as an agent or instrumentality of the police when he spoke with

respondent and obtained his statement. In addition, although respondent may have believed that he was not free to leave the principal's office, an agent of the police did not conduct the questioning nor was it the type of custodial interrogation that would trigger the right to *Miranda* warnings.

Other courts that have considered the issue of the admissibility of statements made to a school official, in the absence of *Miranda* warnings, predominantly have held that such statements are admissible. For example, in *Commonwealth v. Snyder*, 413 Mass. 521, 597 N.E.2d 1363 (1992), the court determined that a student who was suspected of selling drugs was not entitled to be informed of his *Miranda* rights prior to questioning by the school principal and assistant principal. The court held:

> "The *Miranda* rule does not apply to a private citizen or school administrator who is acting neither as an instrument of the police nor as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile. * * * The fact that the school administrators had every intention of turning the mari[j]uana over to the police does not make them agents or instrumentalities of the police in questioning Snyder." *Id.* at 1369.

In ruling that a student was not entitled to *Miranda* warnings before being questioned by the vice-principal, the court in *State v. Biancamano*, 284 N.J.Super. 654, 666 A.2d 199 (App.Div.1995), reasoned:

> "A school official must have leeway to question students regarding activities that constitute either a violation of the law or a violation of school rules. This latitude is necessary to maintain discipline, to determine whether a student should be excluded from the school, and to decide whether further protection is needed for the student being questioned or for others." *Id.* at 202.

The weight of authority is that *Miranda* warnings are necessary only when a defendant is subject to questioning by law-enforcement officials, their agents, and agents of the court while the suspect is in official custody. *See In the Matter of Paul P.*, 170 Cal.App.3d 397, 216 Cal.Rptr. 51 (1985); see also *State v. Tinkham*, 143 N.H. 73, 719 A.2d 580 (1998). Here, because the principal was not acting as an agent of the police when he questioned respondent and because respondent was not subjected to a custodial interrogation by law-enforcement authorities, it was unnecessary to inform respondent of his rights prior to this questioning. Thus, the resulting statement was properly admitted by the trial justice.

■ Next, respondent questions the trial justice's credibility findings. He argues that the trial justice erred in ignoring that portion of respondent's statement in which he alleged that the victim's previous touching of his buttocks had provoked him to the point where the assault was justified. The trial justice, however, did not ignore this portion of respondent's statement, but referred to respondent's alleged justification for the assault in the beginning of her decision. Although she does not expressly say so, it seems apparent that the trial justice did not believe that the excuse given by respondent justified his assaulting the victim. The respondent also contends that the trial justice erred in her evaluation of the testimony of the student witnesses, who claimed that they heard respondent admit to assaulting the victim.

■ Both of these issues concern the trial justice's credibility determinations. It is well settled that the findings of a trial justice on the issue of credibility are conclusive unless an examination of the record discloses that he or she has misconceived or misinterpreted material evidence or that he or she otherwise was clearly wrong. *See Donnelly v. Grey Goose Lines, Inc.*, 667 A.2d 792, 794–95 (R.I. 1995). In challenging the trial justice's credibility determinations concerning the student witnesses, the respondent relies on the fact that the trial justice rejected a portion of the testimony of these individu-

als. Both witnesses testified that they could see all or part of the altercation from where they were situated. After viewing the scene of the assault, however, the trial justice determined that it was unlikely that either witness had an unobstructed view of the incident. As a result, she discounted their testimony as to what they said they had observed visually that day. On the other hand, the trial justice further found that "they were probably accurate in hearing what they heard." It does not appear to us that the trial justice misconceived or misinterpreted the evidence elicited from these witnesses. Rather, she determined that the portion of their testimony in which they indicated that respondent made incriminating statements was credible. Moreover, the respondent has not shown that the trial justice misconceived or misinterpreted material evidence or otherwise was clearly wrong in her judgment on this issue.

For these reasons, we deny and dismiss the respondent's appeal and affirm the Family Court's judgment.